MIDWAY YOUTH FOOTBALL LADIES AUXILIARY, INC., Midway Midget Football League, Inc., Stone Mountain Youth Football Boosters, Inc., and Georgia Association of Italian Americans, Inc., Amvets, American Veterans of World War II, Department of Georgia, Inc., a nonprofit, tax exempt, Georgia Corporation and B'Nai B'Rith Women's Chavey Rot Chapter

v.

William STRICKLAND, Revenue Commissioner of the State of Georgia, Arthur Bolton, Attorney General of the State of Georgia, Randall Peek, District Attorney for Stone Mountain Judicial Circuit (DeKalb-Rockdale Counties), F. Richard Hand, Chief of Police, DeKalb County, Georgia, all in their official capacities.

Civ. A. No. 78–544.

United States District Court,
N. D. Georgia,
Atlanta Division.

April 18, 1978.

Fletcher Thompson, Atlanta, Ga., for plaintiffs.

Arthur K. Bolton, Atty. Gen., Robert S. Stubbs, II, Asst. Atty. Gen., H. Perry Michael, Senior Asst. Atty. Gen., Atlanta, Ga., George P. Dillard, Decatur, Ga., for defendants.

### ORDER

RICHARD C. FREEMAN, District Judge.

This is an action for declaratory and injunctive relief brought by several nonprofit Georgia corporations[1] concerning the alleged unconstitutionality of the Bingo Nonprofit Licensing Act, Ga.L.1977, p. 1164 [hereinafter the "1977 Act"] as amended by House Bill No. 1267 [hereinafter the "1978 Amendment"] signed by the Governor on March 9, 1978. Defendants are the state

---

1. Regardless of whether the named plaintiffs yet have been certified as nonprofit organizations by the Internal Revenue Service and the Georgia Department of Revenue, it appears likely that they all eventually will be so certified. The more difficult question, discussed later in this order, concerns whether these corporations were in fact "operating" the bingo game *sub judice* within the meaning of the constitutional amendment creating the right to play bingo in Georgia.

and local officials who are entrusted with enforcement of the foregoing provisions of Georgia law. Plaintiffs' substantive claims nominally arise under the Fifth and Fourteenth Amendments to the United States Constitution and the jurisdiction of this court is properly predicated upon 28 U.S.C. § 1331 and 1343(3). A hearing was held upon the application for preliminary injunctive relief on April 5 and 6, 1978, and oral argument was heard on the afternoon of April 7, 1978. This court denied plaintiffs' application for preliminary injunctive relief from the Bench and indicated that this opinion would follow. In addition to the application, defendants' several motions to dismiss are presently before this court. Before proceeding to the merits of the action, a brief review of the relevant facts is warranted.

At the hearing representatives of the respective plaintiffs testified that they either had in fact played bingo or wished to play bingo at a facility called the "Club Room, Inc." located at 3507 Memorial Drive in Decatur, Georgia, which did business as the "Bingo Palace." The Bingo Palace was operated by Mr. William F. Wright who is President of Club Room, Inc. However, the stock of Club Room, Inc. is wholly owned by Mrs. Catherine Fleming, who formerly resided in Alabama and Tennessee and who moved to Georgia shortly after the 1976 amendment to the Georgia Constitution, Art. I, § II, ¶ XI, legalized bingo sessions operated by nonprofit organizations. Mr. Wright testified that Mrs. Fleming contributed $25,000 in capital and assets in order to start the Club Room, Inc. While Mr. Wright rented the building from UMET, a California corporation, the lease was guaranteed by a Mr. Silber of Miami, Florida.[2]

The Club Room facility consisted of a 20,000 square foot building which previously had been used as a department store. It was remodeled to include: closed circuit television to project the selection of the bingo numbers, additional lighting, sound equipment, chairs, and schoolroom tables.

A brief overview of Club Room's routine and relationship with the sponsoring organizations and with game players, was presented in the April hearings. Nonprofit organizations "rented" these premises in groups of between four and fifteen for an evening. Each group would have its own single "game" and proceeds from that game would be received by personnel who worked at the Club Room but who arguably were paid on a rotating basis by the various nonprofit organizations. When a player would come to the premises he would purchase "hard boards" at the door. These boards could be used for designated games during the night. The revenue from the sale of these boards was used to finance prizes given during the first few games of the evening. Additional paper sheet games would be sold during the evening and used only for a single specified game. The employees of the various organizations were paid at the end of the evening by those organizations and then subsequently were paid by Club Room, Inc. to clean up the premises. Although the Club Room and the various organizations had permanent books, no permanent tallies were made by the Club Room, Inc. after the money was collected from the sale of the hard boards and cards but before it was divided and distributed to the various organizations.[3] None of the nonprofit organizations had written contractual agreements with Club Room,

2. Chief Hand of the DeKalb County Police Department testified that he had obtained information from the Miami Dade County Police Department that Mr. Silber had run illegal commercial gambling operations in several areas of the country. While not entirely relevant to this action as decided, the information renders "rational" to some degree the legislature's express fear that undesirable elements might invade Georgia bingo operations. It also supports the notion that the statutes under attack represent a proper state exercise of its preroga-

tive and duty to protect the health, safety, and well being of the community.

3. Chief Hand testified that a lack of such records was typical of bingo operations and that "skimming" was often an undesirable and illegal result. While we do not for a moment question Mr. Wright's good faith and candor before this court, the potential for illegal activity nonetheless existed because of the procedures followed at the Bingo Palace.

Inc. and the "rental" paid by the organizations appeared to vary pursuant to terms which are not readily quantifiable. In any event, the evidence demonstrated that the respective organizations often paid as much or more in rental and expenses over the fifteen months during which the Bingo Palace operated as they realized for themselves.

As to financial returns, during the fifteen month period, approximately 2.2 million dollars in receipts were collected by the Club Room, Inc. Of that sum, $343,755 was divided among the nonprofit organizations, $1,543,000 was distributed in prizes, and $181,800 was grossed by the Club Room, Inc. After all expenses were deducted, the Club Room made a net profit of $85,000. In sum then, bingo at the Bingo Palace was big business and while the various nonprofit organizations came and went, the "game" abided.

### THE MERITS

Plaintiffs have argued in their complaint and at closing argument that Georgia courts including the Georgia Supreme Court, which have considered the issue of the constitutionality of the Georgia Bingo Acts, have acted arbitrarily and capriciously and have violated the express language of the constitutional amendment by ruling that the acts are legal and a valid exercise of the state's police power to regulate gambling. Therefore, the plaintiffs reason that this arbitrary and capricious "state action" by the Georgia state courts amounts to a deprivation of plaintiffs' federal constitutional rights requiring redress by this court. It is clear that the propriety of granting the injunction which plaintiffs request turns upon the following traditional prerequisites to equitable relief:

  (1) a substantial likelihood [of success] . . . on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) . . . the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) granting the preliminary injunction will not disserve the public interest.

*Morgan v. Fletcher,* 518 F.2d 236, 239 (5th Cir. 1975); *see e. g., Sadler v. 218 Housing Corp.,* 417 F.Supp. 348 (N.D.Ga.1976); *Hawthorn Environmental Preservation Association v. Coleman,* 417 F.Supp. 1091 (N.D.Ga.), *affirmed,* 551 F.2d 1055 (5th Cir. 1977). However, we believe that plaintiffs' somewhat novel constitutional argument is pretermitted for several reasons which also render preliminary injunctive relief inappropriate.

### STANDING AND RIPENESS

■ Several of the plaintiffs were unsuccessful in showing that they have the concrete interest in this litigation upon which the notion of standing is predicated. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1969). The standing requirement existing in federal court emanates from the case or controversy requirement of Article III of the United States Constitution and is framed in terms of the following two pronged test: (1) has the challenged action caused plaintiff injury in fact, economic or otherwise; and (2) is the interest sought to be protected arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); C. Wright, *Handbook of the Law of Federal Courts,* § 13 at 48 (1976).

■ Applying these principles to the parties before this court, it becomes evident that the Georgia Association of Italian Americans, Inc. [hereinafter the "Italian Americans"]; the Stone Mountain Youth Football Boosters, Inc. [hereinafter the "Boosters"]; and the Am-Vets cannot meet this test. Mr. Karl Maico, a local real estate broker and president of the local Italian Americans' chapter testified that his organization, like the Am-Vets, never applied for a bingo license and never operated a bingo game. At most, he observed that if the Bingo Palace were open, his organization would like to use its services. In essence then, the Italian-Americans and the

Am-Vets have suffered no injury in fact because they have taken no affirmative action whatsoever to seek to comply with the statute or to run afoul of its restrictions. *See generally, Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Even assuming that the Italian Americans and the Am-Vets could allege prospective injury in fact, it would appear that their claims would not be ripe for adjudication absent some beginning attempts to play bingo or to seek a bingo license. Absent such movement, no showing of *present* injury sufficient to satisfy the case or controversy requirement could be made. *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

■ Analogous application of the standing prerequisites to the Boosters is somewhat more complex. Mrs. Joyce K. Smith of the Boosters testified that while her organization had played bingo at Bingo Palace, it had not yet received a determination letter from the I.R.S. "certifying" it as being tax exempt. The amendment to the Georgia constitution legalizing bingo within narrow confines is not attacked here upon either federal or state constitutional grounds. Therefore, its requirement that the organization playing bingo be "nonprofit" would appear to be a threshold requirement which each organization is required to meet before acquiring standing to challenge the subsequently enacted statutory requirements *sub judice.* Plaintiffs' argument that an organization can be "nonprofit" without such authorization is singularly unpersuasive because there appears to be no adequate *a priori* manner in which to determine an organization's nonprofit status oth-

er than through such a procedure. Moreover, the specific language of the constitutional amendment provides that:

> No organization shall be considered a nonprofit organization within the meaning of this Paragraph except a tax-exempt organization within the meaning of the Internal Revenue Code or the Georgia Income Tax Law as such Code and such Law are now or hereafter amended.

Therefore, the Boosters also appear to lack standing and/or their claims are insufficiently ripened to be adjudicated at present. *See generally,* 13 C. Wright and A. Miller, *Federal Practice and Procedure,* § 3532 (1970).

Accordingly, for the reasons hereinabove expressed, defendants' motion to dismiss as to the Italian Americans, Am-Vets, and the Stone Mountain Boosters is hereby GRANTED.

## RES JUDICATA

Defendants argue on the basis of previous suits including *St. John's Melkite Catholic Church, et al. v. Commissioner of Revenue,* 242 S.E.2d 108 (Ga.1978)[4] and the *Club Room, Inc. v. Arthur K. Bolton, et al.,* C.A. No. 77–527A (N.D.Ga., Aug. 30, 1977)[5] (Edenfield, J.), that plaintiffs are precluded from litigating once more the alleged unconstitutionality of the 1977 Act.[6] In addition, defendants argue that an ongoing state nuisance proceeding in DeKalb Superior Court would be interferred with if we rule upon the substance of the instant plaintiffs' claims.

■ The doctrine of *res judicata,* as it applies in Georgia, precludes relitigation between the parties to the original action *or their privies* of all issues which were *or could have been* litigated in the previous

---

**4.** In the *St. John's* case, the Georgia Supreme Court sustained the constitutionality of the 1977 Act against broad-based federal and state constitutional challenges.

**5.** In the *Club Room* case, Judge Edenfield, speaking for this court, denied preliminary injunctive relief because plaintiffs failed to demonstrate their likelihood of success upon the merits. In essence, Judge Edenfield decided,

based upon "principles of *res judicata* or comity", that this court should follow the state court decision in *St. John's.*

**6.** It is clear in the first instance that defendants' *res judicata* claims extend only as far as the 1977 act because the actions in question were litigated prior to the effective date of the 1978 amendment on March 9, 1978.

action when both proceedings concern the same cause of action and the former litigation resulted in a final judgment upon the merits. *Acree v. Air Line Pilots Association,* 390 F.2d 199 (5th Cir. 1968); *Henry v. Mann,* 134 Ga.App. 522, 215 S.E.2d 286 (1975); 18 *Encyclopedia of Georgia Law,* Judgments and Decrees—Res Judicata, § 283 (1970). In applying this test, the court determines whether the same right is infringed by the same wrong, whether a different judgment obtained in the second action would impair rights under the first judgment, and whether the same evidence would sustain both judgments. *Acree v. Air Line Pilots Association, supra,* 390 F.2d at 201.

In this proceeding it is conceded that the cause of action is the same as that in *St. John's* and that the *St. John's* action may have gone to "final judgment" upon its merits.[7] Moreover, plaintiffs' counsel conceded upon oral argument in this action that federal constitutional claims were in fact raised and adjudicated in the *St. John's* action. Accordingly, it appears that the controlling question of the applicability of *res judicata* to this action asks whether the plaintiffs were in privity with parties to the *St. John's* litigation.

The evidence showed that the named plaintiffs in *St. John's,* like the instant plaintiffs, were users of the Club Room. In addition, Mrs. Smith and Mrs. Wright testified that a "defense fund" was established for litigation of the claims involving the group of nonprofit organizations which played at the Club Room and that the costs of the *St. John's* litigation were financed by

that fund. Contributions to the fund were not "voluntary" and when additional funds were needed, the nonprofit organizations which played at the Club Room were assessed a pro-rata share. In essence then, the evidence demonstrated that bingo playing at the Club Room was concerted activity in which all of the nonprofit organizations joined and for which these organizations, pursuant to a quasi-contractual agreement or a verbal contract, were obliged to contribute to the defense fund.

In sum, we find that: (1) the right allegedly infringed, the playing of bingo at the Club Room, was the same as that in the *St. John's* action; (2) the evidence in this action and in the *St. John's* case was substantially the same; and (3) a contrary ruling in this action would impair the Georgia Supreme Court's interpretation of Georgia law rendered in *St. John's.* *See Acree v. Air Line Pilots Association, supra.* We therefore conclude that the instant plaintiffs are in privity with the plaintiffs in *St. John's.*[8] However, since it is not entirely clear that a "final judgment" has been rendered in *St. John's, see* footnote 7, *supra,* and because plaintiffs would not be precluded by *St. John's* from litigating the constitutionality of the 1978 amendments to the 1977 Act which were not in effect at the time *St. John's* was rendered, we will proceed to examine two remaining issues which will be dispositive of the balance of this action.

## THE "OPERATOR" OF THE BINGO GAME

While it initially appeared that the questions which were to be presented to this

**7.** No additional action has followed the denial of a preliminary injunction in *The Club Room, Inc. v. Arthur K. Bolton,* C.A. No. 77–527A (N.D.Ga. Aug. 30, 1977). Moreover, as Judge Edenfield reasoned in the *Club Room* opinion, it is somewhat unclear whether the *St. John's* case has proceeded to "final judgment" because of the remaining time for direct appeal to the United States Supreme Court, and the split of authority in Georgia as to whether an action decided but yet appealable is a "final judgment" for the purposes of *res judicata* merger and bar. *Compare, Coolidge v. Sandwich, Inc.,* 49 Ga.App. 564, 176 S.E. 525 (1934) *with New*

*Amsterdam Casualty Co. v. Russell,* 103 Ga. App. 553, 120 S.E.2d 150 (1961).

**8.** Moreover, as Judge Edenfield concluded in the *Club Room* case, the verbal "rental" agreements entered into between the Club Room and the various nonprofit organizations probably placed them in privity. Likewise, Judge Federal in his opinion denying a temporary restraining order in *Peek v. The Club Room, Inc., supra,* indicated that the non-profit organizations and the Club Room, Inc. had formed a new *de facto* organization encompassing the Club Room and the parties to this litigation.

court were ones of law, a substantial and potentially determinative issue arose concerning which entity "operated" the bingo game in question. Plaintiffs' constitutional challenge attacks the alleged disparity between the Georgia constitutional amendment and the 1977 Act as amended. However, this issue is never reached if the "operator" of the subject bingo game is not a nonprofit organization within the meaning of the Georgia constitutional amendment.[9]

■ The evidence showed that while the Club Room, Inc. delegated as much apparent authority as possible to the various nonprofit organizations which played at its facility, the game was in fact run by Club Room, Inc., an admittedly profit-motivated organization. Moneys were collected by "employees" of the nonprofit organizations who were selected, controlled, and supervised by Mr. Wright. Although these employees nominally were paid by the various organizations, the funds used were originally funneled from the paying public through Club Room to the subject organizations. Likewise, although the "defense fund" nominally was controlled by Mrs. Smith, Mr. Wright conceded that the fund was his idea. The assessment system used was obligatory and a prerequisite to playing bingo at the Bingo Palace. The facility was maintained by Club Room employees and although the organizations playing varied, the game continued, regardless of which organization "sponsored" it. In fact, Mr. Wright testified that he had jokingly remarked to an employee that if the game consisted of 60% black players and the Ku Klux Klan was the sponsor, attendance probably would not drop off. Most importantly, however, Mr. Wright repeatedly admitted and in fact asserted that the expertise required to run the bingo game was supplied by him,[10] free of charge, and that the nonprofit organizations could not have raised as much money as they did without his assistance. Under these circumstances, we have no difficulty concluding that the "operator" of the subject bingo game was the Club Room, Inc. Accordingly, we believe that plaintiffs' constitutional arguments are pretermitted and that the application for preliminary injunctive relief must be denied based upon plaintiffs' failure to demonstrate a substantial likelihood of success upon the merits of this action. *Morgan v. Fletcher, supra.* However, one additional issue merits discussion in view of the apparent need for further hearing upon the application for permanent injunctive relief.

## YOUNGER v. HARRIS AND ITS PROGENY

■ Defendants have vigorously argued that the instant proceeding for declaratory and injunctive relief must be dismissed because of its potential for interference with the nuisance action against Club Room, Inc. which is presently proceeding in DeKalb Superior Court. Since *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), it has been clear that in certain circumstances a federal court may enjoin the enforcement of a state statute on constitutional grounds. However, *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny make it clear that the scope of a federal court's intervention must be carefully limited in the interests of comity and federalism where ongoing state prosecutions are involved.

9. In pertinent part, the Georgia constitutional amendment provides that:
   All lotteries and the sale of lottery tickets, are hereby prohibited; and this prohibition shall be enforced by penal laws, except that the operation of a nonprofit bingo game, when the prizes given do not exceed $1,100 in cash or gifts or equivalent value during any 24-hour period or $2,200 in cash or gifts of equivalent value during any calendar week, shall not be a lottery and shall be legal in this State. *A nonprofit bingo game is one which is operated by a nonprofit organiza-*

*tion.* No organization shall be considered a nonprofit organization within the meaning of this Paragraph except a tax-exempt organization within the meaning of the Internal Revenue Code or the Georgia Income Tax Law as such Code and such Law are now or hereafter amended . . . (emphasis added).

10. Evidently Mr. Wright learned the "trade" from Mrs. Fleming who had a wealth of experience and knowledge in the area.

Although *Younger* originally applied solely in the criminal context, newer authority has found the underlying policy interests of comity and federalism equally applicable in the context of civil or more properly quasi-criminal proceedings. *See Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977). Of particular importance to this action is *Huffman v. Pursue Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). In that action, Ohio officials instituted a proceeding under state statute which identified obscene film showings as a public nuisance. The district court decided the issue of obscenity *vel non* and granted declaratory and injunctive relief without considering whether it should have abstained on the basis of *Younger.* The Supreme Court reversed and remanded holding that federal intervention upon the nuisance action there in issue was as injurious to the interests of comity and federalism as was federal intervention upon a criminal prosecution and that the state forum was fully competent to hear the federal issues in the context of the pending nuisance action. It would seem that the basic rule enunciated in *Huffman* would apply with full force to this action because the previously pending nuisance action in DeKalb Superior Court should present a fully adequate state forum in which plaintiffs may vindicate their federal constitutional rights.

Accordingly, in view of all of the foregoing, including the applicability to this action of *Huffman v. Pursue Ltd., supra,* and other cases in the *Younger* line, and our finding of coextensiveness of interest between the Club Room, Inc. and the named plaintiffs,[11] defendants' motion to dismiss as to all plaintiffs is hereby GRANTED and the instant action is hereby ORDERED to be DISMISSED.

IT IS SO ORDERED.

11. Unlike the situation in *Penthouse International, Ltd. v. McAuliffe,* 436 F.Supp. 1241 (N.D.Ga.1977) (Freeman, J.), the evidence in this action showed that the interests of the named plaintiffs were completely congruent with those of Club Room, Inc. and that all of the parties were capable of presenting a proper defense. In addition, under a strict reading of Georgia law, the Club Room, Inc. and plaintiffs may be in privity. *See* footnote 7, *supra.*