Richard B. KAY, Plaintiff,

v.

Richard H. AUSTIN et al., Defendants.

Cliff FINCH, Plaintiff,

v.

Richard H. AUSTIN, Defendant.

Nos. G80–206 CA5, G80–221 CA5.

United States District Court,
W. D. Michigan, S. D.

April 18, 1980.

Richard B. Kay, Cleveland, Ohio, in pro. per.

Cliff Finch, Jackson, Miss., in pro. per.

Jann Ryan Baugh, Asst. Atty. Gen., Lansing, Mich., for defendants.

## OPINION

DOUGLAS W. HILLMAN, District Judge.

Richard B. Kay and Cliff Finch, both candidates for the presidential nomination

of the Democratic Party, initiated separate actions against Richard H. Austin, Secretary of State of the State of Michigan, charging an unlawful denial of their right to participate in the Michigan Democratic presidential primary. Kay commenced his suit on March 31, 1980, and Finch filed on April 8, 1980. Since the allegations and relief sought in each suit are similar and present common questions of law and fact, the actions are consolidated pursuant to Fed.R.Civ.P. 42(a).

Kay, in addition to suing Austin, also included as a defendant Frank J. Kelley, Attorney General of the State of Michigan. The only mention of Mr. Kelley in the complaint is that he is the duly-elected, qualified and acting Attorney General of the State of Michigan. This Mr. Kelley admits. Since no claim is made against the Attorney General and no genuine issue as to any material fact exists with respect to him, an order of dismissal may be entered in his favor pursuant to Fed.R.Civ.P. 12(b)(6).

This court has original jurisdiction over the subject matter under 28 U.S.C. § 1343(3), pursuant to claims arising under the United States Constitution, Amendment I, Amendment V, and Amendment XIV, and by virtue of alleged violations of 42 U.S.C. §§ 1983 and 1981.

Plaintiffs claim to have formally requested the Michigan Secretary of State to include them on the Democratic ballot for the May 20, 1980, primary election pursuant to the Michigan statute, M.C.L.A. § 168.614. Austin refused their requests. They now claim his refusal was an abuse of discretion or, in the alternative, that the Michigan statute prescribing the procedure by which a presidential candidate can obtain a position on the primary ballot is impermissibly vague and, therefore, unconstitutional.

On March 31, 1980, the day that Kay filed his suit, he sought from this court a temporary restraining order directing that his name be placed on the ballot for the Michigan primary election, or in the alternative, to declare the Michigan statute unconstitutional.

The court immediately called the office of the Attorney General in Lansing, Michigan, advised of the filing of the suit, and scheduled oral argument on plaintiff's temporary restraining order request for Tuesday, April 8, 1980. On that date, Mr. Kay, a practicing attorney from Cleveland, Ohio, appeared in propria persona. Defendants were represented by Jann Ryan Baugh, Assistant Attorney General.

The parties have filed briefs and the matter is now before the court for decision.

## FACTS

In 1972, the Michigan Legislature set up machinery for a statewide presidential primary election to be held on the third Tuesday in May in each presidential election year. M.C.L.A. § 168.614 and § 168.615 provide the step or steps needed to be taken by an individual wishing to appear on the ballot as his party's nominee. Section 614 reads as follows:

Sec. 614. (1) By 4 p. m. of the first Friday in March in each presidential election year, the secretary of state shall issue a list of the individuals generally advocated by the national news media to be potential presidential candidates for each party's nomination by the political parties for which a presidential primary election will be held pursuant to section 613.[1]

(2) By 4 p. m. of the Tuesday following the first Friday in March in each presidential election year, the state central committee of each political party for which a presidential primary election will be held pursuant to section 613 shall file with the secretary of state a list of individuals whom they consider to be potential presidential candidates for their party.

(3) Forthwith after the issuance of his list and then again after receipt of any names from the various state central committees, the secretary of state shall notify each potential presidential candidate so listed of the provisions of this act relating to the presidential primary election.

The statute further provides that a candidate who is turned down in his request to be placed on the ballot by both the Secretary of State and the state central committee of his party shall nevertheless be included on the ballot by filing with the Secretary of State the requisite number of nominating petitions. This alternate route to the ballot is set forth in M.C.L.A. § 168.615, which reads as follows:

Sec. 615. (1) The secretary of state shall cause to be printed on the ballots for the presidential primary under the appropriate political party the name of each presidential candidate who has provided the secretary of state with an affidavit indicating his party preference and willingness to have his name printed on the ballot no later than 4 p. m. of the third Friday in March in each presidential election year. A presidential candidate may withdraw his name from the ballot by notifying the secretary of state no later than 4 p. m. of the third Friday in March in each presidential year. The names of the presidential candidates shall be rotated on the ballot. The ballot shall contain a space for the elector to vote "uncommitted".

(2) An individual who is not listed as a potential presidential candidate in accordance with section 614[1] shall have his name printed on the ballot and for the purposes of this act, shall be considered in the same manner as all presidential candidates listed, upon presentation to the secretary of state, no later than 4 p. m. of the third Friday in March, nominating petitions for that individual along with an affidavit signed by the individual indicating his party preference and willingness to have his name printed on the ballot. The nominating petitions shall contain the valid signatures of registered qualified electors whose number is at least equal to ½ of 1% of the total vote cast in the state at the previous presidential election for the presidential candidate of the political party of the individual. Signatures shall be obtained starting on January 1 except that in 1972, signatures shall be obtained starting on the effective date of this section. The petitions shall conform to the requirements of this act.

## A. KAY.

Richard B. Kay is an attorney residing in the State of Ohio, and a member of the Democratic Party. He serves as a precinct committeeman in Rocky River, Ohio, and is a member of the Democratic Party's Executive Committee for Cuyahoga County, Ohio.

In October, 1978, Kay announced his candidacy for President of the United States during a press conference held at the National Press Club in Washington, D. C. Thereafter, Kay campaigned in 30 states, including Michigan. The plaintiff acquired primary election ballot positions in New Hampshire, Florida, Georgia, Louisiana and Ohio. To date, however, he has failed to acquire a delegate. Kay officially filed with the Federal Elections Commission on July 29, 1979. He receives no federal matching funds.

On January 28, 1980, Kay notified the defendant Secretary of State that he wished to obtain a ballot position on Michigan's presidential election primary to be held on May 20, 1980. The plaintiff provided to the defendant an affidavit in which he alleged that he had been interviewed by over 540 members of the national news media. According to Kay, newspaper clippings (marked Exhibit 1 at the hearing) from around the country were also then furnished to Austin. The defendant Austin has no record of having received these clippings but conceded on the record during the oral argument that he does not contest Kay's statement that Kay had, in fact, mailed them to the defendant.

Plaintiff also wrote to the defendant on February 11, 1980. In that letter, Kay indicated that he had obtained ballot positions in both Florida and Georgia, and that the election laws of those two states contained language closely resembling that in M.C. L.A. § 168.614.

On February 27, 1980, the Director of Elections for the State of Michigan wrote the plaintiff advising him of the require-

ments of Michigan's election law. (See attached Appendix A.) The Director of Elections specifically informed plaintiff of his options under Sections 614(2) and 615(2) should Kay's name not be included on the Secretary of State's list of potential candidates. Kay heard nothing more from the defendant until some time after March 11, 1980, when the plaintiff called the defendant's office. Kay then learned for the first time that his name was not among those chosen by the Secretary of State as potential presidential candidates.[1]

Kay at no time requested the State Central Committee of the Democratic Party to include his name on its list of presidential candidates. Nor did Kay furnish to the Secretary of State petitions sufficient under Section 615(2) for inclusion of his name on the May ballot. For these reasons, Kay's name was omitted from the 250,000 ballots printed after March 21, 1980.

### B. FINCH.

Cliff Finch is a member of the Democratic Party and until recently was the Governor of the State of Mississippi. Finch resigned that position on January 22, 1980, in order to pursue his present presidential campaign. He officially filed with the Federal Elections Commission on February 18, 1980.

Finch obtained ballot positions in Kansas, Louisiana, Tennessee, Maryland, New Mexico, Wisconsin and Georgia. He alleges all of these states except Kansas and Louisiana have candidacy requirements similar to those found in Michigan.

On February 27, 1980, Finch wired the Secretary of State's office requesting placement on the Michigan ballot. He was informed on March 7, 1980, that he was not included on the Secretary of State's list of potential presidential candidates. A request for reconsideration was sent on March 25, 1980. The defendant rejected this request on April 3.

Finch makes no allegation that he requested the State Democratic Party to include his name on its list of candidates. Nor has he alleged compliance with the petition requirements of Section 615(2). Like Kay, Finch's name was ultimately omitted from the primary ballots printed by the Elections Division of the Department of State.

### DISCUSSION

### I.

*Vagueness.*

Plaintiffs charge that the Michigan statute is so vague and indefinite that for all practical purposes it invests in the Secretary of State uncontrolled, dictatorial powers in picking and choosing candidates according to whom he alone wants on the ballot. Further, according to plaintiffs, the statute fails to provide any objective standards for the determination of who has and who has not been "generally advocated by national news media to be potential presidential candidates". Consequently, plaintiffs allege that the statute fails to provide due process and equal protection to all citizens who wish to be on the primary ballot.

■ Certainly with respect to criminal statutes, it has been well established that the statutes must be sufficiently explicit to inform citizens what conduct is proscribed. In *Connally v. General Construction Company,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) the Supreme Court said:

That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that

---

1. The court notes in passing (without in any way either downgrading Mr. Kay's national reputation with the news media, or attempting to second guess Mr. Austin) that it is a reader of four daily newspapers including the daily and Sunday *New York Times,* plus seven monthly national news magazines and Mr. Kay was, to the court at least a total stranger until the day he walked into chambers seeking a temporary restraining order.

men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.

Numerous decisions since then have made it indisputable that the due process clause restricts states from holding individuals criminally responsible for conduct they could not reasonably have understood to be prohibited. *See, Rose v. Locke*, 423 U.S. 48, 49, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975).

Penal statutes are equally impermissible where they provide to law enforcement officers unrestricted delegations of power. *See, Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C.Cir. 1977), a case involving the constitutionality of a Washington, D. C., ordinance establishing police authority to regulate demonstrations, disorderly gatherings, and other emergency situations. There, the court said at 117:

> Vagueness may take two forms, both of which result in a denial of due process. A vague ordinance denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement. *See Gregory v. City of Chicago*, 394 U.S. 111, 120, 89 S.Ct. 946, [951], 22 L.Ed.2d 134 (1969) (Black, J., concurring).

The principle that legislation containing vague standards of conduct or unrestrained delegations of power violates the due process clause applies in certain non-criminal situations as well. *See, Horn v. Burns and Roe*, 536 F.2d 251 (8th Cir. 1976). As the Eighth Circuit panel there noted, however, vague non-criminal statutes are generally not unconstitutional unless "the exaction of obedience to a rule or standard . . . (is) so vague and indefinite as really to be no rule or standard at all . . .", *A. B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925), or where the statute, by its terms,

makes persons of ordinary intelligence guess as to its meaning. 536 F.2d at 254.

While a lesser standard of review is customarily employed when non-criminal statutes are involved, the Supreme Court has ruled that where a law threatens fundamental rights such as freedom of speech or assembly, special judicial scrutiny is required. *See, Rose v. Locke, supra; Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). For this reason, courts are particularly vigilant in ensuring that vague statutes do not act to "chill" the exercise of rights guaranteed by the First Amendment. As the Supreme Court stated in *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963):

> "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."

In the present case, plaintiffs contend that the terms "advocated by the national news media" and "potential presidential candidate", as found in Section 614(1) of Michigan's presidential primary election law, are undefined and imprecise. They assert that the vagueness of this legislation provides the Secretary of State with unlimited authority to place on the ballot whatever name he pleases, in violation of the electors' First Amendment interests in freedom of assembly and the casting of an effective vote. Plaintiffs ask this court to declare that Michigan's presidential primary election law is impermissibly vague and unconstitutional, or alternatively, that the defendant Secretary of State abused his discretion in not listing plaintiffs as potential presidential candidates advocated by the national news media. They seek injunctive relief which would result in inclusion of their names on May's ballot.

Plaintiffs' assertions are not frivolous. The language adopted by the legislature in Section 614(1) is indeed imprecise. How does one define "national news media"? What does "generally advocated" mean? Does this require a showing of national editorial support as opposed to general

news coverage? If a candidate were advocated by the media in all of the states in a particular geographic region, would the lack of "national" support exclude that individual from the Michigan primary? How does the Secretary of State go about determining who is or is not advocated by the national news media?

■ On the other hand, there can be no question that the State of Michigan has a legitimate interest in the integrity of its primary ballot.[2] As stated by Justice Stewart in *Jenness v. Fortson*, 403 U.S. 431 at 442, 91 S.Ct. 1970 at 1976, 29 L.Ed.2d 554 (1970):

> "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception and even frustration of the democratic process at the general election."

The question remains, however, whether the required "preliminary showing" of support, as set forth in the Michigan statute, is reasonably clear, reasonably definite, and an understandable standard by which a potential candidate, as well as the Secretary of State, can be guided. Whether or not the imprecision in the Michigan statute rises to an unconstitutional deprivation of plaintiffs' rights is a difficult and uncertain question. This court entertains serious concern over the imprecise, unclear language contained in Section 614(1) of Michigan's presidential primary election law. However, because I find, for the reasons that follow, that the plaintiffs in this case lack standing to challenge the constitutionality of Section 614(1), the court does not reach this question at this time.[3]

II.

*Standing.*

In recent years, the Supreme Court has frequently considered in detail the doctrine of standing to bring an action in federal court. *See, e. g., Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1978); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1977); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The court summarized this doctrine in *Warth v. Seldin*, where it said at 498–499, 95 S.Ct. at 2205:

> In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. *E. g., Barrows v. Jackson*, 346 U.S. 249, 255–256, [73 S.Ct. 1031, 1034–1035, 97 L.Ed. 1586] (1953). In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society. See *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 221–227, [94 S.Ct. 2925, 2932–2935, 41 L.Ed.2d 706] (1974); *United States v. Richardson*, 418 U.S. 166, 188–197, [94 S.Ct. 2940, 2952, 2956, 41 L.Ed.2d 678] (1974) (POWELL, J., concurring).

> In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question. is whether the plaintiff has "alleged such a personal stake in the outcome of the con-

---

2. The state's legitimate interest in policing its ballot is especially relevant here where, as defendants' counsel advised at oral argument, over 50 persons have sought to obtain a position on Michigan's primary ballot by sending newspaper clippings to the Secretary of State.

3. The question of plaintiffs' standing in this case is raised by the court's own motion. Because standing is an issue which goes to the heart of constitutional federal jurisdiction, this is permissible. *See, Fairley v. Patterson*, 493 F.2d 598 (5th Cir. 1974).

troversy" as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Baker v. Carr*, 369 U.S. 186, 204, [82 S.Ct. 691, 703, 7 L.Ed.2d 663] (1962). The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action . . . ." *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, [93 S.Ct. 1146, 1148, 35 L.Ed.2d 536] (1973). See *Data Processing Service v. Camp*, 397 U.S. 150, 151–154, [90 S.Ct. 827, 829–830, 25 L.Ed.2d 184] (1970).

(Footnote omitted).

Similarly, Justice Powell wrote, in *Gladstone, Realtors v. Bedford, supra*, 441 U.S. at 99–100, 99 S.Ct. at 1608:

The constitutional limits on standing eliminate claims in which the plaintiff has failed to make out a case or controversy between himself and the defendant. In order to satisfy Art. III, the plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, [98 S.Ct. 2620, 2630, 57 L.Ed.2d 595] (1978); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 260–261, [97 S.Ct. 555, 560–561, 50 L.Ed.2d 450] (1977); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, [96 S.Ct. 1917, 1924, 48 L.Ed.2d 450] (1976); *Warth v. Seldin, supra*, [422 U.S.] at 499, [95 S.Ct. at 2205]; *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, [93 S.Ct. 1146, 1148, 35 L.Ed.2d 536] (1973). Otherwise, the exercise of federal jurisdiction "would be gratuitous and thus inconsistent with the Art. III limitation." *Simon v. Eastern Kentucky Welfare Rights Org., supra*, [426 U.S.] at 38, [96 S.Ct. at 1924].

Even when a case falls within these constitutional boundaries, a plaintiff may still lack standing under the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim.

In light of these pronouncements, it is clear that plaintiffs must necessarily have some personal stake in the outcome of their controversies. This is the gist of the requirement of standing, and it is demanded in order to ensure that, due to sufficient adversariness, all relevant issues will be properly presented to the court. *See, Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1961). Plaintiffs must have suffered some distinct injury caused in some direct way by defendants' purportedly illegal conduct. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). On the issue of the requirement that the injury complained of be traced to the conduct of the defendant, *see, Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, where the court said, at 41, 96 S.Ct. 1917 at 1925–1926, 48 L.Ed.2d 450 (1975):

" 'Although the law of standing has been greatly changed in [recent] years, we have steadfastly adhered to the requirement that, at least in the absence of a statute expressly conferring standing, federal plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction.' *Linda R. S. v. Richard D.*, 410 U.S. at 617, [93 S.Ct. at 1148, 35 L.Ed.2d at 540]. In other words, the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court."

In the present case, neither Kay nor Finch was placed on the Michigan presiden-

tial primary ballot, in part, because the defendant Secretary of State concluded that they had not been "advocated by the national news media" to be "potential presidential candidates". Both plaintiffs contend that this ruling by the Secretary of State, the result of an allegedly impermissibly broad grant of power to the defendants, was the only reason for their omission. Kay specifically asserts that had he known what standards the defendant employed in determining which presidential candidates were "advocated by the national news media", he could have demonstrated that he, too, met that test.

In fact, however, plaintiffs are mistaken in asserting that the *only* reason their names were omitted is because Section 614(1) delegates unrestricted authority to the defendant. There is no evidence either candidate made any attempt to compile the requisite signatures for automatic inclusion under Section 615(2).[4] Moreover, neither candidate requested the Democratic State Central Committee to include his name among those listed by the Party pursuant to Section 614(2).[5] The primary election is a means by which political parties in Michigan can effectively narrow the field of persons potentially capable of achieving the nation's highest office. The election, while initiated under state funding and supervision, is primarily an election by and for the political parties themselves. The plaintiffs, according to clippings submitted to the court, are persons of significant authority in the Democratic Party. They necessarily command some influence. There appears to be no reason, and the plaintiffs have alleged none, to believe that the Party would have refused their requests to be placed on the ballot, had requests been made.

█ As knowledgeable members of the Democratic Party, plaintiffs should have first pursued alternative avenues of obtaining ballot status before contending in court that the grant of power to the Secretary of

State is impermissibly broad. Consequently, plaintiffs cannot complain that their injuries are "fairly traceable to the defendant's acts or omissions". *Village of Arlington Heights v. Metropolitan Housing and Development Corporation, supra.* The defendant alone did not cause plaintiffs' apparent rebuff. Plaintiffs themselves contributed to their plight in failing to act upon readily available and promising alternate avenues of relief. I cannot believe, in light of this, that plaintiffs have suffered at the hands of defendant, a "legally cognizable injury". *See, Davis v. Passman*, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1978); *Midway Youth Football Ladies Aux. v. Strickland*, 449 F.Supp. 418 (N.D.Ga.1978). This fact persuades me that the plaintiffs in this case lack standing to challenge the constitutionality of the Michigan presidential primary election law.

█ Although plaintiffs' allegations are serious and potentially meritorious, plaintiffs are not properly before this court. As the Supreme Court recently reiterated, in *Gladstone, Realtors v. Bedford, supra*, the federal judiciary must prudentially avoid deciding questions of broad social import where the litigants are not well-suited to assert particular claims. Michigan's primary election law clearly envisions three alternative avenues for obtaining ballot status which are open to all potential candidates. At least one of these avenues, resort to a party's state central committee via Section 614(2), existed as a readily available alternative to plaintiffs here. I conclude that persons who neglect to pursue their rights under Section 614(2) are not thereafter proper plaintiffs for challenging the constitutionality of the legislative scheme. Although the plaintiffs' names were omitted from the primary ballot because the Secretary of State determined that plaintiffs were not "potential presidential candidates" under Section 614(1), plaintiffs have not demonstrated that their alleged injuries

---

**4.** Neither candidate has challenged the petition requirement as being unduly burdensome.

**5.** In fact, for reasons unrelated to these cases, the Democratic State Central Committee failed to comply with Section 614(2), and did not issue a list of potential presidential candidates.

resulted from defendant's purportedly illegal conduct. For this reason, I dismiss plaintiffs' actions because the "case or the controversy" requirements of Art. III have not been met.

### APPENDIX A

February 27, 1980

Dear Sir:

Your letter relative to your desire to be placed on the ballot at the Michigan Presidential Preference Primary was received and is hereby acknowledged.

Please be advised that Michigan law provides:

> "By 4 p. m. of the first Friday in March in each presidential election year, the secretary of state shall issue a list of the individuals generally advocated by the national news media to be potential presidential candidates for each party's nomination by the political parties for which a presidential primary election will be held . . ." (Sec. 168.614(1), Michigan Compiled Laws.)

If you are selected to have your name on the list you will be notified by the Secretary of State and must forward him an affidavit stating your party preference and your willingness to have your name printed on the ballot.

If your name is not included on the Secretary of State's list you may either:

(1) Contact the state central committee of your party who may add names to the Secretary of State's list, or

(2) File nominating petitions with the Secretary of State by 4 p. m. of the third Friday in March. These petitions must contain signatures of registered voters of the state whose number is equal to ½ of 1% of the total vote cast in Michigan in 1976 for the presidential candidate of the political party on which you wish to have your name appear. (In 1980 these figures would be 8484 for Democratic candidates and 9469 for Republican candidates.) All signatures appearing upon the petitions must have been obtained after January 1, 1980.

In either event you must also file an affidavit stating your party preference and your willingness to have your name appear on the ballot.

Sincerely,

Bernard J. Apol

Director of Elections

BJA:jmf